## In re SKURAT.

(District Court, D. Minnesota, Sixth Division. January 30, 1926.)

1. **Bankruptcy ⟜414(3)—Evidence held not so inherently improbable as to justify reversing referee's finding that bankrupt assigned his interest in farm several years before bankruptcy, though recorded deed was dated within four months of bankruptcy.**

Evidence that bankrupt assigned his interest in deceased father's farm to his mother, who was life tenant, for $1,000, several years before bankruptcy, though recorded deed was dated within four months of bankruptcy, *held* not so inherently improbable as to justify reversing referee's finding to that effect.

2. **Bankruptcy ⟜407(3)—That recorded deed was given in contemplation of bankruptcy held not to justify refusing discharge, if bankrupt had parted with his interest several years before.**

That recorded deed, dated within four months of bankruptcy, was given in contemplation of bankruptcy, would not justify refusal of discharge, if recital therein that it was given to put record title in grantee, to whom farm had been conveyed several years before, were true.

3. **Bankruptcy ⟜408(4).**

Where substantially all consideration for land was paid by bankrupt's mother, bankrupt's failure to claim interest therein in schedules *held* no basis for refusing discharge.

4. **Bankruptcy ⟜29.**

Bankrupt's attorney *held* not disqualified as notary from taking bankrupt's oath to schedules.

**5. Bankruptcy ⬅411—Petition for discharge in bankruptcy should be verified.**

Though petition for discharge of bankrupt is not specifically required to be verified, being in nature of pleading, it should be verified.

**6. Bankruptcy ⬅411.**

Creditors' failure to object that application for discharge in bankruptcy was unverified, or that verification was defective, until after evidence on application was heard, waived objection.

**7. Bankruptcy ⬅415(2).**

On hearing of objections to bankrupt's discharge, special master is required to base his conclusions on evidence, irrespective of previous decision of state court in actions by trustee and others.

**8. Bankruptcy ⬅476—Bankrupt held entitled to extra allowance as costs, where, because of objecting creditors' failure to appear, have matter continued, or notify clerk of order reopening matter, bankrupt was put to considerable expense.**

Where, because of failure of objecting creditors to appear, or have matter continued, and their failure to advise court clerk of subsequent order reopening matter, bankrupt was put to considerable expense, *held*, that bankrupt was entitled to extra allowance as costs, notwithstanding creditors had good reason for not appearing.

In Bankruptcy. In the matter of Emil Skurat, bankrupt. On exceptions of objecting creditors to the special master's report on hearing of specifications of objections to bankrupt's discharge. Report of special master confirmed, and bankrupt discharged.

Frank J. Zima, of Glenwood, Minn., for the objecting creditors.

Herman Zander, of Glenwood, Minn., for bankrupt.

JOHN B. SANBORN, District Judge. The hearing was originally set for December 5, 1925, at a special term of this court held in Minneapolis, Minn. Herman Zander, the attorney for the bankrupt, appeared at that time and moved that the report of the special master be confirmed, and there was no appearance by or on behalf of the objecting creditors. Thereupon the court granted such motion. Thereafter counsel for the bankrupt and for the objecting creditors agreed that an order might be entered, setting aside the order confirming the report, and such order was made and a hearing fixed for the 19th day of December, 1925. The clerk of the United States District Court of the Sixth Division was not notified of such order, and the files were not in court on the 19th day of December.

Thereupon the court ordered that the creditors should serve their brief within five days after December 19, 1925, that the bankrupt should answer thereto within five days thereafter, that the creditors should have five days in which to serve a reply brief, and that the matter should then be considered submitted. It was further agreed by counsel at that time that, if the court found that, because of the delay and expense caused by the failure of the objecting creditors to appear on the 5th day of December, and to have in court the files on the 19th day of December, additional and unreasonable expense had been caused to the bankrupt, that the court might determine what additional costs should be paid to the bankrupt or his attorney by the objecting creditors. Briefs have been filed in accordance with such order, and the court has examined such briefs, and the files and records in said proceeding, and the transcript of the testimony taken before the special master.

The objections filed to the discharge of the bankrupt raised the following questions:

(1) Did the bankrupt, willfully and with intent to hinder, delay, and defraud his creditors, convey an undivided one-eleventh interest in the south half of the southwest quarter of section 16, township 125, range 37, Pope county, Minn., to his mother, Mathilda Skurat, on the 2d day of February, 1924, or did he convey said interest to said Mathilda Skurat in order to give her an unlawful preference, she being a creditor?

(2) Did the bankrupt, with intent to conceal his ownership of an undivided one-eleventh interest in two-thirds of the north half of the northeast quarter and the southeast quarter of the northeast quarter of section 16, township 125, range 37, Pope county, Minn., knowingly omit the same from his bankruptcy schedules, and did he knowingly testify falsely, at the time of his examination under section 21a, in regard to his ownership of an interest in said land?

(3) Did the bankrupt, in order to enable L. C. Schuhmaker and Paul Zemke to purchase certain property mortgaged to the Pope County State Bank and sold at a chattel mortgage foreclosure sale, place in their hands moneys, credits, and other property belonging to him, for the purpose of placing the same beyond the reach of his creditors, within four months prior to the filing of his petition in bankruptcy?

(4) Did the bankrupt, knowingly and with intent to defraud his creditors, and to prefer the Pope County State Bank, of Glenwood, Minn., as a creditor, within four months of the filing of his petition in bankruptcy, in the month of December, 1923,

mortgage to the Pope County State Bank a Holstein bull, and knowingly fail to include the same in his schedules?

(5) Did the bankrupt, with intent to hinder, delay, and defraud his creditors, and to conceal his assets, property, and his financial condition from them and from his trustee, fail to keep records or books of account or memorandums of his business transactions?

The special master, after a full hearing, determined all of these questions adversely to the objecting creditors. There can be no question of the correctness of his findings, so far as they relate to the third, fourth, and fifth specifications, and there would be no useful purpose served in discussing those matters.

[1] The claim of the bankrupt was that the property referred to in the first specification of objection belonged to his mother, and that he had no right, title, or interest in it, having conveyed his interest in it to her in the year 1916, or thereabouts, for a valuable consideration. It appears that the bankrupt is one of eleven children of Joseph Skurat, deceased, and Mathilda Skurat, his wife; that he is a man without much education, and has always been engaged in the business of farming; that he stayed upon the home farm until about the year 1909; that after the death of his father he married, and has never lived there at any time since; that his mother has at all times operated the farm, paid the taxes, and has taken whatever rents or profits accrued therefrom; that on February 14, 1916, a petition for determination of descent of land was filed with the probate court of Pope county, Minn., by Mathilda Skurat, this particular property, at the time of the death of Joseph Skurat, being in his name; that the court entered a decree on the 13th day of March, 1916, whereby the land was assigned to the widow, Mathilda Skurat, for life, and a one-eleventh interest to each of the children, subject to the widow's life estate.

There was evidence to the effect that some time in 1916, or prior thereto, some of the children, including Emil Skurat, conveyed their interests to the mother, and that she paid them some consideration therefor. She testified that she gave each boy $1,000 when he left the farm. Emil Skurat claims that she gave him about $1,000, partly in cash and partly in property, for assigning to her his interest. The testimony to establish this is not clear nor definite, but there is nothing so inherently improbable in it as to justify this court in saying that a finding that that had happened is not justified by the evidence. Neither the son nor the mother were people

of a great deal of intelligence or business experience. It is obvious that they did not consider the state of the record title of any particular importance until about the year 1916, when they filed a petition for determination of descent, and it seems probable that at about that time there was an attempt made to put the title in some one.

[2] It is entirely probable that the deed dated on the 26th day of December, 1923, and within four months of the filing of the petition in bankruptcy, to Mrs. Skurat, the mother, and which was recorded in Book 11 of Deeds, on page 381, in the office of the register of deeds of Pope county, Minn., on February 9, 1924, and which recited: "It is fully understood and agreed by all the parties hereto that the real consideration for this deed is to correct the record title in the grantee herein, and is in place and in lieu of the deed made, executed and delivered to the grantee herein in 1916, which said deed the grantee herein has failed to record, and has been lost by her, the grantee being the mother of the grantors, and a widow with minor children to support, and that this deed is in place and in lieu of said lost deed, for which valuable consideration had been given"—was given with the fact of the insolvency of Emil Skurat and his contemplated bankruptcy in mind; but if the fact is, as the referee finds it to be, that he had, prior to that time, actually parted with his interest in the land, this would not justify a refusal to grant him a discharge.

[3] It also appears from the evidence that on the 4th day of December, 1900, Joseph Skurat, deceased, the father of the bankrupt, became the owner of the real estate referred to in the second specification by assignment of certain school certificates; that on that day he borrowed $500 from one Frederick Abraham, and that, for the purpose of securing the repayment of that loan, he and his wife, Mathilda Skurat, executed and delivered to him an assignment of the certificates; that the loan was paid thereafter by Mathilda Skurat during the lifetime of her husband, but that the certificates were not reassigned to him during his lifetime, but were assigned to her on January 15, 1910, by Frederick Abraham and his wife; and that in or about the year 1911 Mathilda Skurat paid the state of Minnesota the balance due on the land contracts, and received from the state a patent to the land, and has held and occupied the land ever since as her own; and that neither Emil Skurat, the bankrupt, nor any of the other children, has ever claimed any right, title, or interest in it. The evidence shows that substantially all of

the consideration for this land was paid by Mathilda Skurat, and that since 1911, at least, she has had the record title and undisputed possession. The failure of the bankrupt to claim an interest in this property in his schedules could, under the circumstances, not be made the basis of a refusal to grant him a discharge.

[4-6] The objecting creditors raise some question as to the verification of the petition for discharge and a defective verification of the schedules. These objections were not raised in the specification of objections before the special master. Both the schedules and the petition were subject to amendment in this respect, if amendment had been desired; but the objecting creditors participated in this controversy without calling attention to these claimed defects.

It is stated in 1 Collier on Bankruptcy (13th Ed.) p. 364: "It is not thought, however, that a separate verification is so essential as to affect jurisdiction provided the schedules accompany the petition; the oath to the latter, when coupled with its reference to the schedules and what they contain, complies with the statute"—citing Matter of McConnell, 11 Am. Bankr. Rep. 418.

The objecting creditors suggest that the verification would be unobjectionable, if taken before any one other than the attorney for the bankrupt. The attorney for the bankrupt appears to be a notary public, and I find nothing in the Bankruptcy Act (Comp. St. § 9585 et seq.), which disqualifies him from taking the oath of his client. So far as the verification of the petition for discharge is concerned, there is no specific requirement that the petition must be verified; but, in view of the fact that it is in the nature of a pleading, it should no doubt be verified. 1 Collier on Bankruptcy (13th Ed.) p. 490, citing In re Glass (D. C.) 119 F. 509, 9 Am. Bankr. Rep. 391; In re Brown, 112 F. 49, 50 C. C. A. 118, (C. C. A. 5th Cir.) 7 Am. Bankr. Rep. 252.

A failure, however, to object that the application is unverified, until after the evidence on the application has been heard, amounts to a waiver. In re Taylor (D. C.) 188 F. 479, 26 Am. Bankr. Rep. 143; Collier on Bankruptcy (13th Ed.) vol. 1, p. 490. If the objecting creditors had desired to oppose this application for discharge on the ground of defective verification, or lack of verification, the time to have done that would have been prior to the time any evidence was taken, and

I am satisfied that it cannot be raised at this time.

[7] Substantially the only question involved in this review by the court is the question whether the evidence before the special master . was sufficient to sustain his . findings. There is no doubt that it is. It is true, also, that it would sustain contrary findings. He heard the witnesses, observed their appearance, was in touch with the atmosphere of the controversy, and was in a far better position to determine what the facts were than this court would be upon the printed record. The record shows that the trustee secured permission to bring an action against Mathilda Skurat to recover the interest of Emil Skurat in the lands in question, and that a creditor of two of the other Skurat boys also brought an action against her, and that these actions were finally settled, and there is also evidence indicating that the judge of the state court, who had the cases before him, apparently took a contrary view to that of the special master in this case. That, however, has no bearing upon this controversy, and the special master was required to form his conclusions from the evidence which was before him, the correctness of which conclusion this court is not willing to question.

[8] On the question of costs, while it appears that counsel for the objecting creditors had good reasons for not attending the special term of court in Minneapolis at which this hearing was set, it further appears that they did not communicate their excuses to the clerk of the court, or to the judge of the court, and were in default. It is, perhaps, true that counsel for the bankrupt should have consulted them prior to coming to the city; but the briefs indicate that there has been considerable feeling between the parties, and that neither counsel could expect much assistance or co-operation from the other. As a result of the failure of counsel for the objecting creditors to appear, or to have the matter continued, and on account, also, of the failure to advise the clerk of the subsequent order of the court reopening the matter, the bankrupt has been put to some considerable expense, and an allowance of $50 to the bankrupt, in addition to the costs allowed by law, would be fair.

It is ordered that the report of the special master be confirmed, the bankrupt discharged, and that he have the costs and disbursements permitted by law, and, in addition thereto, the sum of $50 additional costs.