**In re Mary C. LOSINSKI, Debtor.**

**Joseph D. LOSINSKI, Plaintiff,**

**v.**

**Mary C. LOSINSKI, Defendant.**

**Bankruptcy No. 3–83–2049.**
**Adv. No. 3–84–83.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 4, 1987.

Wallace C. Sieh, Winona, Minn., for defendant.

William A. Lindquist, Winona, Minn., for plaintiff.

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the undersigned United States Bankruptcy Judge on April 2, 1987, upon the motion of Defendant Mary C. Losinski (hereinafter "Debtor") for dismissal or summary judgment. Debtor appeared by her attorney, Wallace C. Sieh. Plaintiff appeared by his attorney, William A. Lindquist. Upon the moving and responsive documents, briefs and argument of counsel, and all of the other files, records, and proceedings in this adversary proceeding, the Court concludes that Debtor's motion must be denied.

This adversary proceeding suggests a modified obverse of an old law school chestnut: "Bad family relations make hard bankruptcy cases." Debtor is Plaintiff's mother. In this adversary proceeding, Plaintiff seeks to have his mother denied her discharge in bankruptcy under 11 U.S.C. §§ 727(a)(3) and 727(a)(5). He alleges that Debtor has failed to account to him for the disposition of various assets which she inherited from Plaintiff's deceased father, Joseph L. Losinski, or which came into her hands as personal representative of the elder Joseph's estate, and which he alleges should have been available to satisfy two judgments which he obtained when he sued his mother in Minnesota State District Court in 1979–80. On the basis of the record made on this motion, the Court concludes that, while Debtor has facially accounted for the disposition of various assets, she must produce financial records to corroborate her narrative accounting or explain the lack of such records; and, in addition, she must account for additional assets whose existence and disposition has come to light during discovery in this adversary proceeding.

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court on December 7, 1983. At that time, she was a single, 73 year old widow residing in Winona County, Minnesota. During her long marriage to the elder Joseph Losinski, she had six children, of whom Plaintiff is the oldest. While the ultimate source of the bad blood between Plaintiff and Debtor is obscure, the historical facts which gave rise to Plaintiff's major cause of action and, eventually, one of his judgments against Debtor, are set forth in *Losinski v. American Dry Cleaning Co.*, 281 N.W.2d 884 (Minn.1979). Briefly summarized, they are as follows: Debtor and the elder Joseph Losinski founded and built up a successful dry cleaning business in Winona, Minnesota, incorporated under Minnesota law under the name of "American Dry Cleaning Company" and doing business as "Carriage House Cleaners." Debtor, the elder Joseph, and their six children were the incorporators and shareholders of the corporation. As is the case in most family-owned and -run businesses, compliance with corporate formalities was somewhat loose, and, in general, the principals deferred to the business and personal judgment of the elder Joseph. When the elder Joseph was diagnosed with cancer in early 1976 and became too ill to carry on the business, he, Debtor, and the other principals agreed to allow Plaintiff to take over management of the operation. The specific terms and conditions of this arrangement—and, particularly, the permanency thereof—were sharply disputed by the parties in the state court litigation. In June, 1976, Debtor, signing as vice-president of the corporation, executed a lease of the business premises to Plaintiff, which contained an option to purchase the business from the corporation. Relations between Plaintiff and the other shareholder-principals soured in the fall and winter of 1976–7. After the death of the elder Joseph on March 11, 1977, Plaintiff twice tendered the purchase price under the lease option. Debtor refused the tenders and, later that spring, a majority of the shareholders resolved to take action to avoid the purchase option.

Plaintiff thereafter commenced the action for specific performance that resulted in the previously-cited Minnesota Supreme Court decision. The trial court in that action found in Plaintiff's favor and ordered specific performance. The Minnesota Supreme Court reversed, ruling that the lack of prior shareholder consent to the granting of the purchase option and the lack of a subsequent formal, binding ratification by a majority of the shareholders made the option unenforceable against the corporation. The Court noted, however, that Plaintiff had a cause of action against Debtor for breach of an implied warranty of authority arising from actual or implied representations which she made when she executed the lease-with-option while holding herself out as vice-president of the company. 281 N.W.2d at 888 n. 3.

Plaintiff followed the suggested lead and prosecuted lawsuits against Debtor personally in two different actions in 1979. The first action sounded under the implied warranty of authority theory suggested in the Supreme Court opinion; after trial by jury, the Minnesota State District Court entered judgment in Plaintiff's favor against Debtor on July 17, 1977, in the sum of $73,732.97.[1] The second was brought as an action for a partnership accounting; it resulted in entry of judgment in Plaintiff's favor against Debtor on September 8, 1980, in the sum of $7,699.43. Neither party appealed either of these judgments. Over three years after their entry, and after various post-judgment discovery and collection proceedings in state court, Debtor filed for bankruptcy. She scheduled only unsecured debts; those evidenced by Plaintiff's judgments constituted approximately 80 percent of the total, and the balance consisted of various small personal medical and revolving credit obligations, and bills for legal services performed for American Dry Cleaning Company prior to its dissolution. She scheduled as assets only her homestead, household goods and furnishings, and wearing apparel; her claim of exemption to all of this property was duly allowed by passage of the period for objection under BANKR.R. 4003(b), without the lodging of an objection.

Plaintiff timely commenced this adversary proceeding objecting to Debtor's full discharge in bankruptcy. The gravamen of his complaint is that Debtor has failed to account for various bank accounts, life insurance proceeds, stocks, bonds, and other liquid assets which allegedly came into her hands during the elder Joseph's last illness, as personal representative of his probate estate, or as a recipient under his informal estate planning devices or his will; and that she has failed to adequately maintain books and records to document the disposition and present whereabouts of these assets. Debtor's several affidavits and her answers to Plaintiff's interrogatories and requests for admissions allege the following events and circumstances relevant to Plaintiff's accusations.[2]

It appears that, by dint of hard work in the family business, frugality, and prudent investment, Debtor and the elder Joseph built up an estate which by January 1, 1977 included at least $138,000.00 in liquid assets. The record title and ownership of these assets varied; some of them were held by Debtor and her husband jointly, some of them were held by American Dry Cleaning Company, and some of them were held under the name of "Losinski Company," alleged by Debtor to be a partnership

---

**1.** It is not clear from the record on this motion whether this litigation was conducted as a new lawsuit, or whether it was joined by amendment of the complaint in the action which had resulted in the Minnesota Supreme Court appeal. Debtor was named as an individual defendant in the earlier action, and Plaintiff's discovery response gives May 24, 1977 (two years before the Supreme Court decision) as the date on which the lawsuit leading to the larger judgment was commenced. Plaintiff's Answers to Defendant's Interrogatory [sic], ¶ 8 (filed June 20, 1985). It is therefore likely that the latter is the case.

**2.** Specifically, the Court has referred to an affidavit entitled "Explanation of Disposition of Assets and Support of Objections to Request for Admissions," executed by Debtor on August 21, 1985, and filed on August 22, 1985; and Debtor's Response to Plaintiff's Request for Admissions and Debtor's Affidavit, both executed on November 17, 1986, and filed on November 18, 1986.

consisting of the six children. Debtor—or her husband, prior to his death—disposed of these assets in several different stages between January, 1977, and November, 1979. It seems clear that at least all of the 1976-7 transfers were intended by Debtor or her husband as dispositions in lieu of formal probate administration. A summary of the various stages of transfers is as follows:

### I. Liquidation of Bank Savings Accounts:

| Bank and Account No. | Balance | Recipient | |
|---|---|---|---|
| Merchants National Bank #68377 | $2031.38 | Plaintiff | |
| Merchants National Bank #62592 | 2720.54 | Plaintiff | 3 |
| Merchants National Bank #68310 | 4287.71 | Plaintiff | |
| Merchants National Bank #67792 | 5777.71 | Robert Losinski | |
| Merchants National Bank #67790 | 3905.05 | Daniel Losinski | 4 |
| Merchants National Bank #67789 | 3325.61 | James Losinski | |
| First NW National Bank #1241981 | 3725.17 | James Losinski | 5 |

### II. Closing of Piper, Jaffray & Hopwood Account:

On March 25, 1977, Debtor closed an investment account at the brokerage firm of Piper, Jaffray and Hopwood, held in the name of "Losinski Company." Debtor distributed (or, in the case of Plaintiff, states it was initially her plan to distribute) the closing balance of $36,001.58 from this account to the six children as follows:

| | |
|---|---|
| Plaintiff | $ 7294.00[6] |
| Robert Losinski | 3416.00 |
| Daniel Losinski | 3416.00 |
| James Losinski | 7294.00 |
| Marcina Losinski | 7294.00 |
| Rose Losinski | 7294.00 |

3. Accounts closed on January 3, 1977, and balances distributed shortly thereafter.

4. Accounts closed on March 17, 1977, and balances distributed shortly thereafter.

5. Accounts closed on March 31, 1977, and balances distributed shortly thereafter.

6. Debtor acknowledges that she actually paid only a small portion of this amount to Plaintiff.

### III. Miscellaneous Assets Liquidated in 1978-79:

During the two and one-half years after her husband's death, Debtor liquidated a number of other corporate and personal assets and applied the proceeds to various uses. A summary of the assets is as follows:

| Asset | Value |
|---|---|
| National Mutual Benefit of Madison, life insurance on deceased husband | $ 5000.00 |
| Lincoln Life Insurance Company, life insurance on deceased husband | 1000.00 |
| Town & Country State Bank Account #0934004 | 15,050.88 |

In his complaint in this adversary proceeding Plaintiff alleges he received the sum of $1042.00. He asserted his entitlement to the balance as the basis of his cause of action in his second lawsuit against Debtor personally, where he sought an accounting for his share of the partnership assets held under the name of "Losinski Company," and his September 8, 1980 judgment evidences the debt.

| Asset | Value |
|---|---|
| Merchants National Bank Account #62593 | $4,148.49 |
| Withdrawals from Municipal Bond Fund with Miller & Schroeder Municipals, Minneapolis, evidenced by: | |
| Check 38614 | 592.50 |
| Check 38612 | 18,207.29[7] |
| Check 40085 | 22,931.04 |
| Check 40176 | 9,334.40 |
| TOTAL | $ 76,264.60 |

In her affidavit and responses to discovery, Plaintiff alleges that she applied the proceeds from the withdrawal and liquidation of these various assets over a period of two years for the purchase of a car and various household appliances, materials and labor for various repairs to her homestead, payment of attorney fees for defense of Plaintiff's lawsuits against her and various matters commenced by Plaintiff in the probate proceedings, expenses of three trips, purchase of life insurance policies for her various grandchildren, and loans totalling $35,500.00 made to her daughter Marcina for start-up capital for a restaurant business in February, 1978.[8]

Plaintiff has produced photocopies of the various checks from Miller & Schroeder Municipals. She has not produced copies of bank records for any of the various liquidated bank accounts; records from the liquidation of the Piper, Jaffray, and Hopwood account; or records relating to the payment on the life insurance policies. Neither has she produced cancelled checks, receipts, or any other documents relating to her various purchases, trips, or payment of attorney fees.

At some point since Debtor's bankruptcy filing, Plaintiff discovered a December 5, 1980 request to her from the Rochester, Minnesota, District Office of the Internal Revenue Service, alleging that the Internal Revenue Service had received IRS Forms 1099 from several entities which stated they had disbursed various dividend and interest income to Debtor during tax year 1978. The notice further alleged that Debtor had not reported this income in her 1978 tax return and requested verification of it or her non-receipt of it. A summary of the amounts of alleged dividend and interest income is as follows:

| Payor | Amount |
|---|---|
| Shearson Hayden Stone | $ 150.00 |
| Merrill Lynch | 223.00 |
| First Northwestern National Bank | 198.00 |
| Bureau of Public Debt | 14,023.00[9] |

Debtor has refused to respond to Plaintiff's discovery requests for further information relating to the assets on which this dividend and interest income was derived, alleging that the accrual of the income and her acquisition, possession and disposition of these assets was too remote in time from her bankruptcy filing to be material to this adversary proceeding.

## DISCUSSION

Debtor has moved in the alternative for dismissal of Plaintiff's complaint or for summary judgment in her favor. Basically, she seeks an overruling of Plaintiff's objection to her general discharge in bankruptcy. The motion is appropriately treated as one for summary judgment alone, as Debtor refers to affidavits, discovery responses, and additional pleadings other than the complaint itself. FED.R.CIV.P. 12(b), *made applicable to this adversary proceeding by* BANKR.R. 7012. On a motion for summary judgment, the Court is required to grant the motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c), *made applicable to this adversary proceeding by* BANKR.R. 7056. Under re-

---

**7.** This account was held under the name of American Dry Cleaning Company. Debtor alleges that she "borrowed these funds from the corporation" by making this withdrawal on November 2, 1979 and applying the proceeds for her own purposes. She states that she later repaid it by surrendering her 4,260 shares in the corporation, the value of which she alleges to have been approximately $11,600.00.

**8.** Debtor alleges that she forgave these loans when Marcina's restaurant failed.

**9.** In affidavit and argument, Plaintiff acknowledges that this entry represents interest accrued on U.S. savings bonds, whose disbursement upon surrender of the bonds was a taxable event.

cent decisions of the United States Supreme Court, the trial court is to favorably treat motions for summary judgment, where the party opposing summary judgment fails to come forward with evidence that genuinely controverts assertions of material fact made by the moving party on the basis of discovery proceedings, affidavits supporting the motion, and the other contents of the court file, and application of the law to those uncontroverted facts requires judgment in the moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1987) (failure by nonmoving party to produce evidence rebutting moving party's factual assertion that nonmoving party cannot prove an essential element of nonmoving party's case mandates grant of summary judgment in favor of moving party).

Plaintiff seeks to have his mother denied her discharge in bankruptcy under the following language of 11 U.S.C. § 727:

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

.    .    .    .    .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

The general purpose of the provisions for objection to discharge under § 727(a) is to punish the debtor who has abused the debt-or-relief provisions of the Bankruptcy Code, or who has conducted himself in his relations with his creditors in a manner so abusive, unfair, or inequitable so as to fatally taint his petition for bankruptcy relief. *In re Schmit*, 71 B.R. 587, 590 (Bankr.D.Minn.1987); *In re Harrison*, 71 B.R. 457, 459 (Bankr.D.Minn.1987); *In re Brown*, 56 B.R. 63, 66 (Bankr.D.N.H.1985). Sections 727(a)(3) and 727(a)(5) are designed to promote the integrity of the bankruptcy process by requiring a debtor to fully account for his past and present financial dealings and condition at the request of the trustee or creditors, as a prerequisite to grant of discharge. *In re Drenckhahn*, 77 B.R. 697, 707, 709 (Bankr.D.Minn.1987); *In re Tackett*, 67 B.R. 354, 359 (Bankr.E.D.Tenn.1986); *In re Shapiro*, 59 B.R. 844, 847–8 (Bankr.E.D.N.Y.1986). Adversary proceedings under these provisions are somewhat unique in that they have the express goal and result of enabling (and even forcing) discovery for use in the main bankruptcy case or other adversary proceedings, but also constitute an independent proceeding which may afford the substantive relief of denial of discharge. It is open to the debtor in a proceeding under § 727(a)(3) to produce relevant financial records or to account for their unavailability at trial, even though he has not done so prior to the commencement of the bankruptcy case or during the administration of the bankruptcy estate. Under the plain language of § 727(a)(5), it is also open to the debtor to make a satisfactory explanation of his insolvency at any point up to the completion of trial in the adversary proceeding, even if he has not previously been forthcoming with such an explanation. *In re Drenckhahn*, 77 B.R. at 709. It is, therefore, possible to summarily adjudicate such an objection to discharge on motion of a defendant-debtor, if the debtor either produces all material financial records of a nature and extent commensurate to his business activity or credibly accounts for their absence, and has explained his insolvency in a consistent, coherent, and believable fashion during discovery proceedings and in any affidavits

supporting the motion. *See, in general, In re Drenckhahn,* 77 B.R. 697.[10]

Via his complaint and his various moving and responsive documents, Plaintiff seeks an accounting from Debtor for the disposition of numerous valuable assets, and corroboration of that accounting via the production of actual financial records. He requests the sanction of denial of discharge for Debtor's alleged failure and inability to provide the accounting and corroboration. Debtor now moves for summary judgment, arguing that she has adequately accounted for the assets and transactions specifically described in Plaintiff's complaint, or, in the alternative, that any further inquiry into those assets should be time-barred. She further argues that any inquiry into the additional assets and transactions discovered during Plaintiff's post-petition investigation is, by now, time-barred. Thus framed, her motion requires a bifurcated treatment.

## I. Sufficiency of Accounting and Explanation Tendered Thus Far.

It is obvious from the specific references made in Plaintiff's complaint that he was aware that his parents had interests in numerous bank accounts, investments, and other liquid assets prior to his father's death. It is obvious that the other family members simply decided to "stonewall" any effort by Plaintiff to be involved in the administration of the elder Joseph's estate or to be privy to any information relating to any family member's entitlement or receipt from that estate, formal or informal, before or after the elder Joseph's death. It is obvious that Debtor headed and probably directed this process. The exclusion of Plaintiff from all family affairs very nearly coincided with his commencement and prosecution of acrimonious business litigation against the family corporation, his mother, and his siblings. It is obscure—and probably irrelevant at this point—whether the commencement of the litigation prompted the exclusion, or vice versa; what is clear is that the exclusion and the prosecution of the litigation then had a synergistic effect, destroying any remaining mutual bond between Plaintiff and his family. This sad state of affairs suggests an obvious motivation for Debtor's unwillingness to respond in any way to Plaintiff's post-judgment collection proceedings in the state court actions and then, to discovery during most of the pendency of this bankruptcy case and adversary proceeding. These circumstances do not, however, excuse and absolve Debtor of her duty to be forthcoming with Plaintiff, her bankruptcy trustee, or any other creditor affected by her case. Via her somewhat belated (but admittedly detailed) discovery responses, Debtor has purported to give a comprehensive accounting for the assets specifically referenced in Plaintiff's complaint and various discovery requests. Admittedly, she did this only after renewed motions to compel discovery, as well as one or more prior, unproductive examinations in proceedings supplementary to execution in the state-court actions. It is obvious that she has now responded only because she must, because her failure to do so could lead to a denial of discharge under § 727(a)(5).

■ Plaintiff argues that Debtor has not produced the actual financial records to "corroborate" her statements of the disposition of these assets. This Court has previously concluded that it is not necessary in all proceedings under § 727(a)(5) to produce corroborating papers, where the debtor's testimonial explanation is sufficiently credible. *In re Drenckhahn,* 77 B.R. at 710. *See also In re Church,* 47 B.R. 186, 192 (Bankr.E.D.Tenn.1985). The credibility of the debtor's testimonial explanation should be gauged in light of all of the surrounding circumstances, however. *Id.* Here, Debtor stands accused of dissipating numerous probate-estate and personal assets via transfers to all of the members of

---

**10.** Given the general substantive requirement to construe provisions for objection to discharge strictly in favor of the debtor and strictly against the objecting creditor; the manifest requirement that the debtor be afforded ample opportunity to adequately explain the circumstances of his insolvency and/or the absence of financial records even though the creditor makes a *prima facie* case; and the debtor's option to explain his insolvency at any point through the end of a § 727(a)(5) trial, adjudication of such objections to discharge on motion of the objecting creditor is almost inevitably inappropriate.

her family other than Plaintiff or via diversion of such assets to her personal use, while she was embroiled in the disputes leading up to Plaintiff's lawsuits and, then, their long prosecution through trial and appeal. To be sure, most of the personal expenditures which she alleges are on their face reasonable in amount and nature. The purchase of a new car and household appliances, the making of homestead repairs, and even the taking of one or more trips are, outside of this context, entirely defensible as the normal steps which an elderly woman would take in the wake of her husband's death to ensure that her personal needs were met in the years of her retirement. Other uses of the funds— particularly the massive loans to Marcina— are less naturally to be expected in the case of an elderly widow coming into substantial inheritance assets, and these explanations for disposition of valuable assets do not on their face bear credibility equal to those for personal expenditures. In any event, the surrounding circumstances—particularly the coincidence of substantial expenditures with litigation seeking both personal and corporate liability—require that Debtor either furnish corroborating documentation or account for its unavailability.[11] Notwithstanding the fact that Plaintiff's response to Debtor's Rule 56 motion is purely legal—i.e., that Debtor cannot rest solely on her own narrative accounting for § 727(a)(5) purposes and must produce documentary corroboration—it still points out the existence of a triable fact issue, which must be addressed either by production at trial of the documents or the Court's assessment of the credibility of any uncorroborated narrative accounting and Debtor's excuse for not maintaining and preserving corroborating records. Debtor has not even directly addressed the triable fact issue remaining on the § 727(a)(3) count, as she has not produced the actual records or made any statement accounting for their unavailability. In the case of the various assets and transfers described in Debtor's responses to Plaintiff's requests for admissions, she may account for them by producing bank or brokerage-house records relating to the closed savings and investment accounts; the originals or photocopies of cancelled checks or money orders showing the recipients of the funds from the various closed accounts; other bank records to reflect the disposition of proceeds from life insurance and any other liquid assets; and receipts or invoices from the various providers and vendors of appliances, vehicles, home repairs, and legal services.[12]

## II. Time–Barring and Relevancy Argument re: 1976–79 Transactions and Their Sources.

On December 5, 1980, the Internal Revenue Service issued a request to Debtor to provide additional information on her receipt of certain dividend and interest income which she had not declared on her 1978 income tax returns. At some point after its issuance, Plaintiff became aware of this request and obtained a copy of it. In written discovery in this adversary proceeding (most recently via interrogatories and requests for admission filed on April 6, 1987), Plaintiff has demanded that Debtor account for the disposition of this interest or dividend income and the funds or accounts on which it was earned, and that she produce corroborating documents. Debtor has responded to these discovery requests by objecting to, and refusing to answer, all requests going to these matters and to

11. These circumstances make this case distinguishable from *Drenckhahn*, where this Court declined to require a farmer-debtor to produce additional corroborating documents relating to the disposition of several pieces of near-valueless farming equipment and the transfer of a dissolution homestead lien in satisfaction of a delinquent child support obligation. The record in *Drenckhahn* contained no strong proof that the debtor was transferring assets while besieged by litigation or creditor collection; in addition, he produced adequate documentation to show the nature and circumstances of his transfer of the one asset alleged that had any real value. *See* 77 B.R. at 709–10.

12. In her first and second answers to Plaintiff's first interrogatories (as filed on May 16, 1984, and July 5, 1984), Debtor stated that she did not have numerous records necessary to account for specific amounts of funds. Her later discovery responses recite such detail that it is probable that she now has retrieved copies of many of the appropriate documents.

other transactions in 1976 or prior years, stating that they "are not relevant to this case and [are] not discoverable under the Federal Rules of Civil Procedure rule number 26." Defendant's Responses to First Requests for Admissions, filed November 5, 1986. In her motion for summary judgment, Debtor takes the position that she is entitled to summary judgment on Plaintiff's cause of action as to any transaction or property which was the subject of the Internal Revenue Service inquiry for tax year 1978, on the ground that all such assets and transactions are too remote in time from December 7, 1983, when she filed her bankruptcy petition. She asserts that this argument is also applicable to the assets and transactions for which she has furnished a narrative accounting, to the extent that that accounting does not meet the statutory standards of sufficiency. She argues that 11 U.S.C. §§ 727(a)(3) and 727(a)(5), as a matter of law, require her to account only for transactions which occurred, and assets which she possessed and disposed of, within "a reasonable time" before she filed for bankruptcy—and that the subject matter of these requests is outside this "reasonable time." Her counsel suggests that, as a measure of this "reasonable time," a two-year period[13] is an appropriate term for which a debtor in his client's circumstances can be required to account.

11 U.S.C. §§ 727(a)(3) and 727(a)(5) do not set forth any specific time period for which a debtor is to be required to account for his pre-petition financial condition. Congress obviously intended to leave the determination of an appropriate period to judicial development. Curiously, reported case law under the Bankruptcy Code of 1978 treating this issue is rather sparse. Case law under §§ 14c(2) and 14c(7) of the Bankruptcy Act of 1898, as amended, has somewhat more fully developed the issue— if perhaps only by indirection—and the Court in a Code case may resort to it for guidance.[14]

Those cases even indirectly treating the issue of the time period subject to inquiry under §§ 727(a)(3) and 727(a)(5) and their Bankruptcy Act predecessors have uniformly noted that a debtor may be called to account for his business and personal financial transactions "for a reasonable period in the past," i.e., prior to the commencement of his bankruptcy case. *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir.1971); *In re Underhill*, 82 F.2d 258, 260 (2d Cir.1936). The cases under the Act unanimously hold that the adequacy of the particular books and records—and the sufficiency of the bankrupt's explanation of his insolvency— must be measured on a case-by-case basis, taking into consideration the individual circumstances and specific business and personal events befalling each debtor. *See, e.g., Rhoades v. Wikle, supra; Union Bank v. Hoskins*, 422 F.2d 1311 (9th Cir. 1970); *In re Underhill*, 82 F.2d at 259–60; *In re Earl*, 45 F.2d 492, 493 (8th Cir.1930); *In re Neiderhauser*, 45 F.2d 489, 490 (8th Cir.1930).

The Court has been unable to find any reported decision in which a bankrupt or debtor responded to discovery inquiries, or the substantive request for relief, in an objection to discharge based on 11 U.S.C. §§ 727(a)(3) and 727(a)(5) or their Bankruptcy Act predecessors, by refusing to account for transactions because they oc-

**13.** Which, he suggests, is somehow given the force of law by its inclusion in Items 2.d., 2.e., 3.a., 4.a., 4.b., and 5 of Official Bankruptcy Form No. 7, the Statement of Financial Affairs for Debtor Not Engaged in Business.

**14.** The language from the Act provisions is as follows:

c. The court shall grant the discharge unless satisfied that the bankrupt has ... (2) destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of accounts or records, from which his financial condition and business transactions might be ascer-

tained, unless the court deems such acts or failure to have been justified under all the circumstances of the case; or ... (7) has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities ...

The language of the Act and the Code provisions is identical or almost identical; therefore, case law developed under the Act provisions affords strong guidance for interpretation of the Code provisions. *In re Chalik*, 748 F.2d 616, 619 n. 4 (11th Cir.1984); *In re Martin*, 698 F.2d 883, 886 (7th Cir.1983).

curred too long before the commencement of the bankruptcy case. It was certainly open to bankrupts in Act cases and debtors in Code cases to raise the argument. Whether they have or not, it is clear that the bankruptcy and appellate courts have at least impliedly authorized inquiries probing relatively deeply into the bankrupt's/debtor's pre-bankruptcy history. While none of the reported opinions directly address the issue of whether such a long-term inquiry is appropriate, the fact that they make or review the inquiry at least implicitly supports its propriety.[15] *See, e.g., Union Bank v. Hoskins* (considering 1961–2 transactions); *In re Underhill* (considering assets and transactions dating from more than three years before adjudication in bankruptcy); *In re Caplan,* 149 F.2d 731 (2d Cir.1945) (considering assignment for benefit of creditors made in 1930, in bankruptcy case commenced in 1944); *Morris Plan Indust. Bank of N.Y. v. Dreher,* 144 F.2d 60 (2d Cir.1944) (considering events and transactions in bankrupt's first business activity, thirteen years before adjudication in bankruptcy, though deeming present lack of records and specific accounting justifiable due to lapse of time); *Gross v. Fidelity & Deposit Co. of Md.,* 302 F.2d 338 (8th Cir.1962) (considering events and transactions occurring four to five years before bankruptcy filing, though deeming loss of records forgivable);[16] *Nix v. Sternberg,* 38 F.2d 611 (8th Cir.1930) (considering lack of business records for transactions from 1920–on, and denying discharge); *In re Spitzer,* 83 F.Supp. 380, 383 (S.D.N.Y.1949) (considering business transactions and events occurring up to 23 years before commencement of bankruptcy case, though forgiving bankrupt's inability to produce records at such a late date); *In re Skurat,* 14 F.2d 490 (D.Minn.1926) (considering transactions with family members in informal settlement of bankrupt's father's estate, which

took place eight years before adjudication in bankruptcy). Only a few reported decisions under the Code involve inquiries extending more than a year to two prepetition, but by treating such longer-term inquiries without comment they are in agreement with the decisions under the Act. *See In re Chalik* (considering debtor's corporate holdings more than two years pre-petition); *In re Hendren,* 51 B.R. 781 (Bankr. E.D.Tenn.1985) (considering assets and transactions six years and more pre-petition); *In re Belk,* 44 B.R. 793 (Bankr.S.D. Fla.1984) (considering debtor's acquisition of corporate stocks in 1950 and continued holdings through a point five years pre-petition); *In re Kottwitz,* 42 B.R. 566 (Bankr. W.D.Mo.1984) (considering assets held and transactions occurring in 1979 and before, in 1984 bankruptcy case).

Thus, it is clear that the temporal depth of the inquiry permissible under §§ 727(a)(3) and 727(a)(5) cannot be set according to a rigid rule; it must be determined only on a case-by-case basis, bearing in mind that, under the statute, "... the interests protected are those of creditors and ... the [debtor] is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Koufman v. Sheinwald,* 83 F.2d 977, 980 (1st Cir.1936); *In re Kinney,* 33 B.R. 594, 596 (Bankr.N.D.Ohio 1983). As one prominent Bankruptcy Act commentator noted,

> ... it is "all the circumstances of the case" which are to be considered when a bankrupt seeks to justify his lack of records, and if there is something furtive or suspicious about the bankrupt's loss or disposition of his records, leaving his transactions and financial condition clouded, lapse of time will not, of itself, clear him for discharge.

---

**15.** One court went so far as to require a determination of whether the bankrupt kept adequate books and records during his entire business career. *In re McNay,* 58 F.Supp. 960, 964 (S.D.Cal.1945). In setting the parameters of the inquiry so broadly and in establishing a relatively rigid rule of accountability for the bankrupt, this decision is an isolated one and runs against the great weight of authority.

**16.** The Eighth Circuit opinion does not reveal the dates of the transactions in question, though the District Court opinion does. *See In re Gross,* 188 F.Supp. 324, 329–30 (N.D. Iowa 1960).

7 J. HENDERSON, REMINGTON ON BANKRUPTCY § 3115 at 228 (6th ed. 1955) (citations omitted). In the ordinary consumer bankruptcy case, it is probably reasonable to limit an inquiry under §§ 727(a)(3) and 727(a)(5) to a period of two years before the commencement of the case, in the absence of evidence suggesting earlier fraudulent transfers or other sanctionable or avoidable dissipation of assets. However, the Bankruptcy Court should not circumscribe the inquiry which a trustee, creditor, or other party in interest may properly make under §§ 727(a)(3) and 727(a)(5) by setting a hard-and-fast rule limiting the inquiry to events and transactions occurring within a specific number of months or years before the bankruptcy case.

█ Here, Plaintiff and Debtor were involved as early as 1977 in hotly-contested litigation, in which Debtor was named individually as a defendant, and which from its commencement had the potential of resulting in a substantial personal judgment against Debtor. The family dispute that gave rise to that lawsuit began in 1976 or earlier. As a result of the elder Joseph's last illness and death, during the pendency of the litigation Debtor obtained control over, or interests in, assets of substantial value. The evidence indicates she either parted with every last one of those assets, or converted them to property which she could then claim as exempt. Debtor properly and vigorously defended the state court litigation and, after she lost it, failed to respond to collection process and discovery when Plaintiff attempted to force her to account for the family wealth which had passed through her hands. Debtor ultimately invoked the remedies administered by this Court, and at this point cannot be criticized or penalized for doing so. However, as a condition of grant of discharge—the basic debtor's remedy in bankruptcy—Debtor must now account to her creditors—including Plaintiff, her son and her major creditor. *In re Martin*, 698 F.2d at 888. She cannot exempt herself from that duty by blandly asserting the status of an unversed, elderly housewife unaccustomed to dealing with large sums of money

in the world of business. The factual backdrop to this adversary proceeding tends to indicate something different. Under the facts presented here, basic fairness allows Plaintiff to maintain his challenge to discharge under §§ 727(a)(3) and 727(a)(5), and to call Debtor to account for all of her transactions in her and her husband's wealth from early 1976–on, as a pre-condition to grant of discharge in bankruptcy. *See In re Gorman*, 14 B.R. 776 (Bankr.N.D.Ala.1981) (considering discovery conducted during nine-year pendency of pre-petition litigation as relevant in determination of whether debtor had accounted for his insolvency). To be sure, the events in question are *now* somewhat remote by the passage of time—but the delay has largely been occasioned by trial and appellate litigation in state court and the litigation in this Court. To allow Debtor to escape her responsibility to account to her creditors would only encourage besieged debtors to resort to pre- and post-petition dilatory litigation tactics, in the hopes that during the pendency of litigation they could nominally divest themselves of all non-exempt assets and, by the passage of time alone, make it so difficult to investigate and recover them that the dispositions might be insulated from fraudulent-conveyance attack. Protecting such conduct would only impair the integrity of the Bankruptcy Court's jurisdiction.

As a result, Plaintiff's motion for summary judgment as to the transactions referenced by the December, 1980 IRS request must be denied in its entirety. There are still triable issues of fact relating to the subject matter of the request, as Debtor has not even attempted to respond to Plaintiff's inquiry on that subject matter. Debtor must account for the interest and principal funds which are the subject of that request, and either produce corroborating documents or account for their unavailability. Otherwise, she will be subject to denial of her general discharge in bankruptcy. To the extent that Plaintiff's time-bar argument is directed to resisting further inquiry on assets and transactions she has already divulged, it must be rejected and she must

be denied summary judgment on that issue as well.

### III. Conclusion

This adversary proceeding has been pending for almost four years. The delay and uncertainty clearly have not been easy for the parties. Now that this Court's legal positions on the issues joined by Plaintiff's complaint are clear, counsel and the parties are on notice that this matter will proceed to trial as early as possible and that—at least insofar as it is subject to this Court's jurisdiction—this unfortunate and disturbing dispute will be put to an end. Toward that goal, the Court has entered an order disposing of all of Plaintiff's pending discovery motions, and a scheduling order setting forth deadlines for completion of any remaining discovery, joinder of all discovery motions, and trial briefing. Counsel and the parties will be held strictly to the terms of the scheduling order so this matter may promptly be put at an end.

IT IS THEREFORE ORDERED that Debtor's motion for dismissal or summary judgment is denied, with prejudice to a renewal of the same or a similar motion, and that this matter shall proceed to trial in accordance with the terms of the scheduling order entered this date.