

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>SEAN PAUL NEVETT and SHANNON LEE NEVETT,<br>　　　　　　Debtors. | BAP No.  SC-20-1154-SGB<br><br>Bk. No. 15-07986-CL7<br><br>Adv. No. 18-90038-CL |
| SEAN PAUL NEVETT,<br>　　　　　Appellant,<br>v.<br>UNITED STATES TRUSTEE,<br>　　　　　Appellee. | **MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Southern District of California
Christopher B. Latham, Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and BRAND, Bankruptcy Judges.

## INTRODUCTION

Sean Paul Nevett appeals from the bankruptcy court's denial of his

discharge under § 727(a)(3) [1] for failing to keep records of his use of loan

proceeds he received from Mitch Pullman and Heath Bell, dating as far

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

1

back as six years before he filed bankruptcy. Mr. Nevett contends that the court clearly erred when it imposed a six-year "lookback" on his duty to keep records of his material transactions. He contends that given the age of the two loans, his failure to keep adequate records was justified. He alternately asserts that even without records of his use of these loan proceeds, he produced ample documents to the United States Trustee ("UST"), which provided a clear and complete understanding of his current financial condition at the time he filed for bankruptcy.

The bankruptcy court determined otherwise, based largely on the nature of Mr. Nevett's business dealings, the amount of money lent to him in the years before he filed bankruptcy, the scarce funds in his possession at the time he filed bankruptcy, and Mr. Nevett's inconsistent testimony regarding how he had used the Pullman and Bell loan proceeds. Forced to speculate about what happened to the full amount of the Pullman and Bell loan proceeds, the court disagreed that Mr. Nevett had otherwise provided sufficient information to discern his current financial condition.

We find no reversible error in the bankruptcy court's determinations. Accordingly, we AFFIRM.

## FACTS

### A.    Mr. Nevett's background, the bankruptcy, and the UST's initial discovery.

Mr. Nevett holds a bachelor's degree in real estate finance from the University of Southern California. For several years he held a stockbroker's

2

license (series 7 and 24). Over the span of thirty years he initially was employed as a stockbroker and later formed his own consulting and investment services companies.

The Nevetts commenced their bankruptcy case by filing a joint chapter 7 petition in December 2015. They listed total assets of $1,720,002.49 and total liabilities of $7,320,467.61. Of their liabilities, nearly $6,000,000 was owed to their general unsecured creditors. The Nevetts listed the vast majority of their general unsecured debt as "business obligations." In fact, $5,178,842 of this debt originated from loans Mr. Nevett received from eleven individuals ranging from 2009 through 2015. This appeal arose from the UST's efforts to understand how Mr. Nevett used these loan proceeds. Though he borrowed over $5,000,000, at the time of their bankruptcy filing the Nevetts had less than $10,000 in cash and bank account balances.

The UST examined the Nevetts at the § 341(a) first meeting of creditors and subsequently requested a number of documents to better understand the Nevetts' financial condition. The UST reviewed documents produced by them in September 2016 and January 2017. The UST then sought documentation explaining the disposition of the loan proceeds from the individual lenders. In March 2017, the UST and Mr. Nevett stipulated to an examination and production of documents under Rule 2004. Again, the UST sought documentation explaining Mr. Nevett's receipt and disbursement of the loan proceeds. The Rule 2004 exam was conducted and

continued from time to time beginning in April 2017 and ending in February 2018.

## B.     The UST's objection-to-discharge complaint.

Unsatisfied with the completeness and perceived reliability of Mr. Nevett's explanation, the UST filed a complaint in March 2018 objecting to Mr. Nevett's discharge under § 727(a)(3) and (5). The complaint detailed the Nevetts' assets and liabilities as stated in their schedules. It also referenced Mr. Nevett's disclosure of his prepetition income from operating his consulting services business through Checkpoint Marketing, Inc. But the complaint focused on the $5,178,842 in loans from the individual lenders. The UST alleged that Mr. Nevett had no documentation explaining the disposition of the $1,500,000 in loans he received from Deanne Gage ($25,000 loaned in 2010), Heath Bell ($500,000 loaned in 2011), Mitch Pullman ($475,000 loaned between 2009 and 2010),[2] and Steve Zeldin ($500,000 loaned in 2009).

The complaint based this allegation on Mr. Nevett's Rule 2004 examination, during which he testified that he had no records to support his use of the $1,500,000 in loan proceeds. The complaint also referenced the inconsistency between his Rule 2004 examination testimony and his sworn schedules. The schedules identified the loans from individual lenders as "business obligations," but Mr. Nevett later testified that he used

---

[2] Pullman lent Mr. Nevett a total of $900,000. However, as per the complaint, Mr. Nevett only failed to provide documentation accounting for $475,000 of the $900,000.

some of the loan proceeds to pay credit card bills, home mortgage installments, and utility bills.

## C.     The UST's summary judgment motion and Mr. Nevett's response.

The UST moved for summary judgment focusing on Mr. Nevett's admitted lack of documentation supporting his claimed disposition of the $1,500,000 in loan proceeds. The UST contended that Mr. Nevett failed to maintain adequate books and records pertaining to these proceeds. As a result of this failure, the UST posited that it could not meaningfully ascertain his financial condition and the nature of some of his material business transactions. This, the UST argued, justified denial of his discharge under § 727(a)(3). According to the UST, given Mr. Nevett's education in finance, his securities background, and his experience in providing consulting and investment services through his wholly-owned companies, he qualified as a highly-sophisticated debtor, who reasonably could be expected to maintain records regarding his use of the $1,500,000 in loan proceeds which were ostensibly procured as business obligations. And his unjustified failure to do so was sufficient to support its § 727(a)(3) claim.

As for its § 727(a)(5) claim, the UST argued that the same facts demonstrated the requisite failure to adequately explain the absence of the loan proceeds as part of Mr. Nevett's assets at the time of his bankruptcy filing.

Mr. Nevett opposed the summary judgment motion. He argued that he produced sufficient documentation to give the UST a "clear picture of [his] financial condition" during the four years immediately preceding his bankruptcy filing — from January 2012 to December 2015. As Mr. Nevett explained, he provided the UST with a plethora of documents from this period, including complete sets of personal and business bank account statements, credit card statements, and tax returns. He further pointed to the promissory notes and check registers he produced. He insisted that these documents provided the UST with "specific transactions and accountings for much of the loans received between years 2012 to 2015."

With respect to the $1,500,000 in loan proceeds, Mr. Nevett explained that these loan proceeds were paid to him (or on his behalf) during the time period between 2009 and 2011—a period for which his records admittedly were incomplete. However, Mr. Nevett insisted that for the subject loans, whenever his documentation was incomplete, he specified third parties from whom documentation might be obtained.

**D.  Mr. Nevett's explanation for the subject loans in response to the summary judgment motion.**

**1.  Bell loan transaction ($500,000 to invest in Location Based Technology for or on behalf of RFF Family Partnership).**

As part of his summary judgment opposition, Mr. Nevett recounted his Rule 2004 exam testimony wherein he explained to the UST that the $500,000 he received from Heath Bell was used to purchase and exercise an

option for 1,000,000 shares of Location Based Technology at $0.50 per share. According to Mr. Nevett, he told the UST that Location Based Technology's transfer agent — Transhare — delivered the stock shares directly to one of his other lenders (the RFF Family Partnership), which liquidated the shares to pay off a debt Mr. Nevett owed to that lender.

According to Mr. Nevett, he offered to subpoena these records from Transhare, but the UST declined the offer.

### 2. Zeldin loan transaction ($500,000 to pay off Wells Fargo Advisors' margin call).

With respect to the $500,000 loan from Steve Zeldin, Mr. Nevett initially testified at his Rule 2004 examination that he did not have any records regarding its use because the entire amount was paid directly by Zeldin to Wells Fargo Advisors to pay off Mr. Nevett's margin call obligation. However, his summary judgment opposition included a bank statement reflecting a wire transfer from Zeldin to Well Fargo Advisers for $494,224.17. Mr. Nevett stated that this wire transfer record was the record of the disposition of the Zeldin loan proceeds.

### 3. Gage loan transaction ($25,000 to invest in Hawaii Mona Protein Powder).

As for the $25,000 Gage loan, Mr. Nevett stated that it was used as part of his investment in a company known as Hawaii Mona Protein Powder, which ultimately failed. But he admitted that he did not have in his possession or control any documents reflecting that investment.

7

**4. Pullman loan transaction ($475,000 to invest in O'Quinn LLC and in Transpacific Aerospace).**

Finally, as for the $475,000 Pullman loan, Mr. Nevett asserted that $400,000.00 was invested in a company known as O'Quinn LLC, from whom supporting records presumably could be subpoenaed – even though Mr. Nevett said O'Quinn was the subject of its own bankruptcy case. The remaining $75,000 portion of the Pullman loan was used to purchase stock in a company known as Transpacific Aerospace. Though Mr. Nevett was unable to provide any evidence of the $400,000 that he purportedly invested in O'Quinn, LLC, Mr. Nevett provided the UST with the stock certificate for Transpacific Aerospace to account for the $75,000 loaned by Pullman.

In short, Mr. Nevett argued that given the age of these loans — some of them dating back as many as six years before his bankruptcy filing — his explanation and production of supporting documents was reasonable and adequate under the circumstances.

**E. The bankruptcy court's interim order on the summary judgment motion.**

After considering the parties' summary judgment papers, the court accepted the documentation supporting Mr. Nevett's claimed disposition of the Zeldin loan ($500,000) and $75,000 of the Pullman loan proceeds. The court held that summary judgment was inappropriate as this

8

documentation raised a genuine dispute whether Mr. Nevett had produced sufficient records as to those loans.

With respect to the Bell loan ($500,000), the larger Pullman loan ($400,000), and the Gage loan ($25,000), the court ruled that there was no factual dispute that Mr. Nevett had failed to maintain any records relating to these transactions. As the court determined, there also was no genuine dispute that the absence of such records prevented the UST from fully understanding Mr. Nevett's financial condition at the time of his bankruptcy filing and his material business transactions. The court explained that these facts — established for purposes of summary judgment — shifted the burden to Mr. Nevett to show that his failure to maintain such records was justified under the circumstances. According to the court, there was a genuine issue of material fact regarding whether the Bell, Pullman, and Gage loans were so temporally remote from Mr. Nevett's bankruptcy filing as to render it unreasonable to expect Mr. Nevett to have retained any records respecting his use of the loan proceeds from these transactions.

As a result, the court ordered the summary judgment proceeding held in abeyance and set this factual issue for trial.[3]

---

[3] The bankruptcy court never returned to the question of whether Mr. Nevett presented sufficient records of the Zeldin loan and smaller Pullman loan ($75,000).

**F.    Trial and the court's post-trial findings.**

The court held a one-day trial on May 14, 2019. The court initially admonished the parties that the trial was limited to the issue of justification and what constituted a reasonable lookback period for requiring Mr. Nevett to keep records regarding his use of the Gage, Pullman, and Bell loan proceeds. The court told the parties that they need not and should not present evidence at trial regarding the matters it deemed established after it heard the UST's summary judgment motion.

After holding the trial, the court rendered its "Factual Findings After Evidentiary Hearing." The court did not, however, limit its findings to the issues of justification and the reasonable lookback period for Mr. Nevett's use of the subject loan proceeds. Rather, it made findings concerning Mr. Nevett's use of the Pullman (larger), Bell, and Gage loan proceeds.

More specifically, Mr. Nevett's check registers and related trial testimony established that only $28,000 of the $400,000 Pullman loan proceeds were used for purposes other than investing in O'Quinn LLC. The court pointed out that this trial testimony conflicted with Mr. Nevett's Rule 2004 examination testimony that he had used the entire $400,000 of the Pullman loan proceeds to invest in O'Quinn. Regardless of how Mr. Nevett actually used the Pullman loan proceeds, there remained no records for the disposition of $372,000 of these proceeds.

At trial, Mr. Nevett's account of how he used the Bell loan proceeds changed even more dramatically. While he had previously stated in

10

opposition to the UST's motion for summary judgment that he used the entire $500,000 loan to purchase 1,000,000 shares of Location Based Technology stock and then delivered the shares to the RFF Family Partnership, Mr. Nevett used his check registers and related trial testimony to show that $491,000 of the $500,000 Bell loan proceeds were used for purposes other than investing in Location Based Technology. He testified that based on the check register he presented as his Trial Exhibit A, he actually used $491,000 of the Bell loan proceeds "to make payments on pending bills, debts and loan payments." While inconsistent with Mr. Nevett's prior explanations, the court credited the check registers as accurate and contemporaneous records of the disbursement of $491,000 of the Bell loan proceeds. But there remained no disbursement records for the $9,000 balance of the Bell loan.

As for the $25,000 Gage loan transaction, the court noted Mr. Nevett's proffered explanation that he invested in a company called Hawaii Mona Protein Powder was "inadequate on its face." Yet, the court also considered the size of the loan, its age, and the fact that Mr. Nevett testified at trial that he largely repaid this loan. The court accepted this trial testimony and concluded that the Gage loan transaction and Mr. Nevett's use of the proceeds was not a material transaction for which Mr. Nevett reasonably could have been expected to retain records.

In sum, the UST commenced the case because Mr. Nevett had failed to provide adequate records for $1,500,000 in loan proceeds he had

received. Mr. Nevett was eventually able to produce adequate records for $575,000 of those loan proceeds in response to the UST's motion for summary judgment, and the bankruptcy court held on summary judgment that he had failed to produce adequate records for the remaining $925,000 in loan proceeds. This prompted the trial at which Mr. Nevett then presented adequate documentation accounting for another $544,000 of the remaining loan proceeds. On the other hand, after trial there were still no records explaining Mr. Nevett's use of $381,000.00 of the loan proceeds from the Pullman and Bell loans, and the court determined that Mr. Nevett's failure to keep such records was unreasonable for purposes of § 727(a)(3).

In addition, the bankruptcy court revisited and reaffirmed its earlier summary judgment determination that, under all the circumstances, records regarding these transactions were necessary in order to enable the UST to fully understand Mr. Nevett's financial condition and material transactions — especially in light of the conflicting trial evidence regarding his use of the Pullman and Bell loan proceeds.

With respect to the justification issue and what constitutes a reasonable lookback period, the bankruptcy court again examined all of the circumstances and found that the Pullman and Bell loan transactions fell within the time period for which Mr. Nevett reasonably should have retained records documenting his receipt and disbursement of the loan proceeds. In making this finding, the court primarily relied on Mr. Nevett's

12

education, training, business experience, and sophistication, and on the size and nature of these two transactions.

**G.    The bankruptcy court's final ruling and Mr. Nevett's appeals.**

Based on its findings after trial and on its prior interim order on the summary judgment motion, the court entered an "Order Granting Summary Judgment and Denying Discharge." The court recited that it had previously determined that the UST had met her prima facie burden as to the Gage, Pullman, and Bell loans totaling $925,000 in loan proceeds. However, it applied its findings after trial to reduce further the unexplained loan proceeds to only the $381,000 from the larger Pullman and Bell loans.[4] As previously found in its interim order, the court noted that the burden had shifted to Mr. Nevett to justify the failure to keep adequate records for the disposition of those funds. The court then found that Mr. Nevett had not justified the failure to keep adequate records for the $381,000 in funds received from the Pullman and Bell loans warranting denial of his discharge.

The court entered judgment pursuant to § 727(a)(3) denying Mr. Nevett his discharge on August 8, 2019. Mr. Nevett appealed on August 22, 2019. This initial appeal was dismissed as interlocutory, *see Nevett v. U.S.*

---

[4] The court discussed the Gage loan in its Order Granting Summary Judgment and Denying Discharge and concluded that it was not unreasonable for Mr. Nevett to have failed to preserve adequate records for that loan given the size of the loan and the testimony that it had largely been repaid. We construe this as a finding that Mr. Nevett established an adequate justification for the lack of records as to the Gage loan.

13

*Trustee*, BAP No. SC-19-1203 (9th Cir. BAP Mar. 3, 2020), because the bankruptcy court's decision had not disposed of the UST's § 727(a)(5) claim. In light of its denial of Mr. Nevett's discharge under § 727(a)(3), the bankruptcy court declined to dispose of the § 727(a)(5) claim.

Subsequently, based on the parties' stipulation, the court entered final judgment on the § 727(a)(3) claim in accordance with Civil Rule 54(b), made applicable in adversary proceedings by Rule 7054. Mr. Nevett timely appealed the final judgment.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court commit reversible error when it denied Mr. Nevett's discharge pursuant to § 727(a)(3)?

## STANDARDS OF REVIEW

As stated in *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010), in cases concerning denial of discharge under § 727, we typically apply the following standards of review:

> (1) the [bankruptcy] court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

(quoting *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004), *aff'd*, 212 Fed. App'x 589 (9th Cir. 2006)).

We rely on the court's initial grant of summary judgment as to the adequacy and necessity determinations and review those issues de novo.[5]

---

[5] The parties do not challenge the bankruptcy court's use of summary judgment by which it entered an "interim" order that it held in abeyance while it conducted an "evidentiary hearing," and then entered a final order granting summary judgment. As such, we express no opinion as to the propriety of the procedures used except to note that it has complicated our review on appeal. The court granted summary judgment after conducting an evidentiary hearing and making findings of fact. This appears internally inconsistent and raises concerns about the appropriate standard of review. However, Civil Rule 42(b) (made applicable in adversary proceedings by Rule 7042) authorizes trial courts to "order a separate **trial** of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." (Emphasis added.) In addition, Civil Rule 56(g) (made applicable in adversary proceedings by Rule 7056) enables courts to grant partial relief on a summary judgment motion by identifying specific material facts as not genuinely disputed and thereafter treating those facts as established. In substance, this is exactly what appears to have happened here. But any final ruling following partial resolution of the case by summary judgment and partial resolution of the remaining issues after trial would still be a judgment after trial. For this reason, we treat the court's denial of discharge as a decision after trial on separate issues limited by its prior grant of summary judgment. Even then, the court's findings after trial could be read as revisiting its initial order on summary judgment as it revised the court's prior summary judgment on the adequacy of the records produced. As the findings of fact after trial revised the scope of the summary judgment granted, they could call into question the propriety of applying de novo review to the two issues determined by the initial grant of summary judgment: the adequacy of the records produced and the necessity for such records. *See Hussain v. Malik (In re Hussain)*, 508 B.R. 417, 424-25 (9th Cir. BAP 2014) (applying clearly erroneous standard of review to both elements of creditor's prima facie case under § 727(a)(3)). But in this instance, the court's Order Granting Summary Judgment and Denying Discharge reaffirmed the initial grant of partial summary judgment as to the remaining unexplained balances of the Bell and Pullman loans, so we treat the summary judgment as controlling on the issues of adequacy and necessity. We also note that our result would not differ if we were to treat the court's determinations of adequacy and necessity as findings after trial, which would be subject to the more deferential clearly erroneous standard.

*See Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 808 (9th Cir. 2019).

But there is another issue we must address complicating the applicable standards of review. Even though the bankruptcy court determined the justification issue after trial, this issue arguably could be viewed as a mixed question of fact and law requiring the application of facts to the applicable legal rules. If so viewed, a reflexive recitation of *Retz*'s standards of review could mistakenly lead to a conclusion that all mixed questions of fact and law are subject to de novo review. But the determination of the applicable standard of review is more nuanced.

There are two distinct categories of mixed questions: those where legal issues predominate and those where factual issues predominate. *See U.S. Bank Nat'l Ass'n ex rel CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 967 (2018). When the mixed question principally requires the court "to expound on the law, particularly by amplifying or elaborating on a broad legal standard," the mixed question is considered predominantly legal and is subject to de novo review. *Id.* But when the mixed question primarily requires the court to make a case-specific inquiry based on a group of facts already established — or to make an additional factual inference from those facts — the resolution of the question is inherently factual in nature, and the appellate court needs to apply the more-deferential clearly erroneous standard of review. *Id.* at 967-68; *see also Aspen Skiing Co. v. Cherrett (In re Cherrett)*, 873 F.3d 1066 (9th Cir.

2017) ("Mixed questions are typically reviewed de novo, but, depending on the nature of the inquiry involved, may be reviewed under a more deferential clearly erroneous standard." (cleaned up)).

Assuming without deciding that the justification question presented herein qualifies as a mixed question of fact and law, it is precisely and unequivocally the latter type of mixed question —a predominantly factual one. To resolve this question, the bankruptcy court needed to look at the totality of circumstances presented and decide whether a reasonable person would have been justified under the circumstances in failing to keep adequate records. As the Ninth Circuit has stated, the justification question hinges on "whether others in like circumstances would ordinarily keep [records]." *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 763 (9th Cir. 2008*)* (quoting *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1299 (9th Cir. 1994)).

Consequently, we will apply the de novo standard of review to the adequacy and necessity issues, and we will apply the clearly erroneous standard of review to the justification issue.

When we review a matter de novo, we consider it anew as if it were not previously ruled on by the bankruptcy court. *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014). In contrast, a factual finding is not clearly erroneous unless it is illogical, implausible, or without support in the record. *In re Retz*, 606 F.3d at 1196.

17

# DISCUSSION

## A.     General Legal standards governing § 727(a)(3).

The bankruptcy court must deny the debtor a discharge if he or she fails to keep or preserve written records from which his or her financial condition and material business transactions can be ascertained. § 727(a)(3); *In re Caneva*, 550 F.3d at 761 (citing *In re Cox*, 41 F.3d at 1296). Thus, in order to qualify for a discharge, § 727(a)(3) requires the debtor to maintain sufficient financial records to enable his or her creditors "reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Id.* (quoting *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971)).

To rule on a § 727(a)(3) claim, the bankruptcy court typically must engage in a two-step process. *Brandenfels v. Ticor Title Ins. Co. (In re Brandenfels)*, BAP No. OR-14-1145-FJuKi, 2015 WL 5883317, at *6 (9th Cir. BAP Oct. 7, 2015), *aff'd*, 692 F. App'x 461 (9th Cir. 2017). First, the court must consider whether the party challenging the discharge has made a prima facie case by demonstrating that: "(1) the debtor failed to maintain and preserve adequate records; and (2) this failure rendered it impossible to ascertain the debtor's financial condition and material business transactions." *In re Hussain*, 508 B.R. at 424 (citing *In re Caneva*, 550 F.3d at 761). And second, if the plaintiff meets its prima facie case, "the burden shifts to the debtor to justify the inadequacy or nonexistence of records." *Id.*

18

**B.     Mr. Nevett's arguments on appeal.**

Mr. Nevett's arguments on appeal are relatively sparse and limited in scope. Relying principally on the length of time that passed between the loans at issue and when he filed for bankruptcy, Mr. Nevett challenged the court's determination that adequate records were needed but not provided for these loans. Charitably construed, this argument implicates both elements of the UST's prima facie case, as well as the justification question. We address each of these questions below.

**1.     Adequacy and necessity of records.**

In his opening appeal brief, Mr. Nevett did not directly challenge the bankruptcy court's determination that the debtor failed to create and preserve adequate records regarding his use of the $381,000 consisting of Pullman and Bell loan proceeds. Instead, he argued that he kept and produced copious records generally covering his transactions and financial condition during the four years immediately preceding his bankruptcy filing — from January 2012 to December 2015. Mr. Nevett contended that the 2012 through 2015 records were "adequate" in the general sense. He also argued that the UST did not need anything else to understand his financial condition at the time he filed bankruptcy or his material transactions.

In the alternative, Mr. Nevett argued that to the extent he did need to keep records specifically addressing his earlier use of the Pullman and Bell loan proceeds, and his failure to keep or produce such records was

19

inadequate, the UST should have requested them from third parties instead of seeking to deny his discharge.

Strikingly, the debtor-appellant in *Caneva* made almost identical arguments. There, the debtor Caneva owned or controlled roughly fifteen businesses and admitted during his Rule 2004 exam that he kept no records for these entities. Similarly, he had no documentation concerning a $500,000 payment he made to an individual named Bowden. Creditor Sun Communities Operating Limited Partnership objected to Caneva's discharge and sought summary judgment on its claim under § 727(a)(3). The bankruptcy court entered summary judgment in favor of Sun, and the district court affirmed the bankruptcy court's judgment.

On appeal to the Ninth Circuit, Caneva argued that Sun could have obtained any necessary records regarding the $500,000 transaction with Bowden from the public record generated in his criminal prosecution. He further asserted that the substantial quantity of documents he did keep and produce concerning other transactions he was involved in and other aspects of his financial condition were sufficient to create a genuine issue of material fact regarding both elements required to establish Sun's prima facie case — both the adequacy of records kept and the need for additional records to understand his finances and transactions.

The Ninth Circuit rejected Caneva's arguments and affirmed the summary judgment. It explained that § 727(a)(3) imposes an "affirmative duty" on debtors to create and preserve records. *In re Caneva*, 550 F.3d at

20

762 (citing *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)). The *Caneva* court further observed that the more sophisticated the debtor, the more demanding his or her duty to keep records — both in terms of quantity and quality. *Id.* Based on this reasoning, *Caneva* held:

> when a debtor owns and controls numerous business entities and engages in substantial financial transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation of 11 U.S.C. § 727(a)(3). Likewise, we hold that when a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer or the fact that the payment actually took place establishes a prima facie violation of 11 U.S.C. § 727(a)(3).

*Id.*

*Caneva* recognized that the debtor still could have avoided summary judgment if he had presented sufficient evidence to demonstrate a genuine issue of material fact "as to whether such failure [to keep records] was justified under the circumstances." *Id.* at 763. *Caneva* concluded that the debtor presented no such evidence, in the process noting that a "transfer of a half million dollars is the kind of transaction for which most business entities would preserve some record." *Id.*

Here, Mr. Nevett admitted during his Rule 2004 examination that he kept no records to support his claimed disposition of the Bell, Pullman, and Gage loan proceeds, supposedly used to purchase interests in third party entities or, alternatively, to pay his business and personal debts. Nor did Mr. Nevett attempt to retract this admission in his summary judgment

21

opposition. At the time of the bankruptcy court's summary judgment ruling, the amount of the Bell, Pullman, and Gage loan proceeds unaccounted for was $925,000. Given the substantial amount at issue, there was no genuine dispute that this amount required documentation. And Mr. Nevett conceded he had not kept any records for these three loans. The UST established for summary judgment purposes that a financially sophisticated, educated, and experienced businessman had failed to produce any records to establish the disposition of close to a million dollars where he had been able to do so for other similar loans borrowed during that same time frame. Following *Caneva*, as we must, the absence of any records for the use of these significant loan proceeds established not only the inadequacy of the records kept but the need for such records in order to understand Mr. Nevett's finances and transactions.

Though the bankruptcy court here subsequently modified its ruling after trial by giving Mr. Nevett credit for the content of his check registers, which accounted for the disposition of $544,000 of the $925,000, the remaining $381,000 unaccounted for is still a substantial sum. Mr. Nevett has never argued that the $119,000 difference between the $500,000 unaccounted for in *Caneva* and the $381,000 ultimately unaccounted for herein distinguishes his appeal from *Caneva*. Nor are we aware of any reasoned basis for saying so.

In short, under *Caneva*, the bankruptcy court correctly granted summary judgment in favor of the UST on the adequacy and necessity elements required for its prima facie case under § 727(a)(3).

**2.    Justification.**

Mr. Nevett primarily contends that the court erred by imposing a six-year lookback period for requiring records relating to his use of the loan proceeds from the Pullman and Bell loans. According to Mr. Nevett, on the record presented, the bankruptcy court clearly erred when it found that his failure to keep such records was unjustified. More specifically, he maintains that it was unreasonable to expect him to keep such records given that these two loan transactions occurred between four and six years prior to his bankruptcy filing.

Mr. Nevett additionally points to his testimony that the loan proceeds were used to invest in companies that since that time had failed and over which he had no control. Thus, he reasons that he should not be faulted for his inability to obtain the missing records from them. He further insists that the voluminous records he produced detailing his financial condition and business transactions within three years of his bankruptcy filing amply demonstrated the reasonableness of his record keeping practices.

The justification issue requires the court to consider all of the relevant circumstances of the case. *In re Cox*, 41 F.3d at 1297. "If the extent and nature of the debtor's transactions were such that others in like

circumstances would ordinarily keep financial records, she must show more than that she did not comprehend the need for them." *Id.* "In such cases, the justification must indicate that because of unusual circumstances, the debtor was absolved from the duty to maintain records herself." *Id.*

The following non-exclusive factors can help inform the bankruptcy court's consideration of the justification issue: "debtor's education, the sophistication of the debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances." *Tan v. Tranche 1 (SVP–AMC), Inc. (In re Tan)*, BAP No. NC–06–1372–RSD, 2007 WL 7541007, at *12 (9th Cir. BAP Sept. 28, 2007); *see also In re Cox*, 41 F.3d at 1299 (referencing the same list of factors and citing in support *Singer Sewing Co. v. Harmon (In re Harmon)*, Adv. No. 91–00147, 1992 WL 13624, at *5 (Bankr. W.D. Tenn. Jan. 10, 1992)).

These same factors also inform the court's decision regarding how far back it is reasonable to expect a debtor to keep records regarding his financial transactions. *See Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia)*, BAP No. CC–06–1176–MaBPa, 2007 WL 7540987, at *11 (9th Cir. BAP Sept. 5, 2007) ("Debtors are required to keep records for a 'reasonable' period of time for § 727(a)(3) purposes, and a court's determination of 'reasonableness' depends on the particular facts and circumstances of each case.").[6]

---

[6] The court and the parties cited a number of cases addressing what constitutes a reasonable lookback period for purposes of § 727(a)(3). *See, e.g., Snyder v. Dykes (In re Dykes)*, 590 B.R. 904, 912-13 (8th Cir. BAP 2018); *DeWine v. Scott (In re Scott)*, 566 B.R. 471 (Bankr. N.D. Ohio 2017); *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542, 548 (Bankr. S.D. Fla.

We disagree with Mr. Nevett that the bankruptcy court's finding that it was reasonable under the circumstances to have expected Mr. Nevett to maintain records regarding his use of the Pullman and Bell loan proceeds was clearly erroneous. In addition to the age of these two loan transactions, the court considered the amount and nature of the transactions, the nature of Mr. Nevett's overall business dealings, the millions of dollars in loans and investment funds Mr. Nevett managed during the course of his career, the types of records he typically kept, and his overall level of sophistication, education, and experience.

The court also considered Mr. Nevett's trial testimony and the contents of the check registers he produced, which contradicted his earlier Rule 2004 exam testimony regarding his use of the loan proceeds. Mr. Nevett testified during his Rule 2004 exam that he used $400,000.00 of the Pullman loan proceeds to invest in O'Quinn LLC. His check registers established, however, that Mr. Nevett used $28,000 of the Pullman loan proceeds for purposes that were not related to O'Quinn, LLC. Similarly, Mr. Nevett testified during his Rule 2004 exam that he used the $500,000 from the Bell loan to invest in Location Based Technology, but the check

---

2007), *Structured Asset Servs. v. Self (In re Self)*, 325 B.R. 224, 241–42 (Bankr. N.D. Ill. 2005); *Losinski v. Losinski (In re Losinski)*, 80 B.R. 464, 474 (Bankr. D. Minn. 1987). Virtually all of these cases recognize that what constitutes a reasonable lookback period must be determined on a case-by-case basis. *But see In re Self*, 325 B.R. at 241 (listing two cases limiting lookback to a period of two years before the bankruptcy filing absent evidence of avoidable transfers or dissipation of assets).

registers established that Mr. Nevett used at least $491,000 of the Bell loan proceeds for personal expenses rather than investing in Location Based Technology.

Additionally, the bankruptcy court expressed concern that, in spite of his borrowing millions of dollars in the years leading up to his bankruptcy filing, Mr. Nevett and his spouse had less than $10,000.00 in cash and in bank accounts at the time they filed their petition.

Based on all of these circumstances, the bankruptcy court inferred that Mr. Nevett lacked sufficient justification for failing to maintain adequate records regarding his use of the Pullman and Bell loan proceeds. On this record, this inference was logical, plausible, and supported by the evidence.

It is clear that Mr. Nevett views the evidence differently and would instead infer from the evidence that his failure to keep adequate records was sufficiently justified. However, even if we assume that Mr. Nevett's posited inference is likewise logical, plausible, and supported by the evidence, the court's choice between two reasonable views of the evidence is not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

### 3.    Intent.

Finally, Mr. Nevett argues that any failure on his part to keep adequate records was innocent and inadvertent, as opposed to intentional and culpable. Mr. Nevett maintains that it was inappropriate for the court

26

to "punish" him for failing to keep adequate records in the absence of bad faith or other wrongful intent. This argument lacks merit. As Mr. Nevett concedes, fraudulent or bad-faith intent is not required to support a claim under § 727(a)(3). *In re Cox*, 41 F.3d at 1297; *accord*, *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, Adv. No. 01–06321, 2003 WL 21981707, at *9 (Bankr. D. Idaho July 17, 2003). Therefore, we reject Mr. Nevett's intent argument.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's judgment denying Mr. Nevett his discharge under § 727(a)(3).